THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

REBECCA C. HOWELL　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　Plaintiff　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　　　: 　3:12-cv-1171
　　　　　　　　　　　　　　　　　　　: 　(JUDGE MARIANI)
RAYMOURS FURNITURE CO., INC.,　　　:
individually and t/d/b/a　　　　　　　　:
RAYMOUR & FLANIGAN　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　Defendant　　　　　　　　　　　:

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Rebecca C. Howell filed a two-count Complaint against Defendant Raymours Furniture Company, trading as Raymour and Flanigan. (Doc. 1). This case involves claims of wrongful termination pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. § 951, *et seq.* Presently before the Court is Defendant's Motion for Summary Judgment. (Doc. 21). For the reasons that follow, the Court will deny Defendant's motion.

### II. Statement of Undisputed Facts

Defendant is a retail furniture company. (Def.'s Statement of Material Undisputed Facts ("Def.'s Stmt."), Doc. 21-2, at ¶ 1). In 1998, Defendant hired Plaintiff as an at-will employee to perform the duties of a Visual Merchandiser. (*Id.* at ¶¶ 7, 12-13). Visual

Merchandisers are responsible for maintaining "the overall appearance of the showroom" and ensuring that it is "updated, professional, inviting and pleasing to the buying public[.]" (*Id.* at ¶ 4). Specifically, the Visual Merchandiser's responsibilities include: (1) developing showroom display plans within Defendant's guidelines, (2) working with the sales agents and warehouse employees to ensure furniture is placed on the showroom consistent with those display plans, (3) "[c]hecking in all new merchandise arriving at the showroom" and (4) tagging accessories. (*Id.* at ¶ 16). After working as a Visual Merchandiser in several of Defendant's locations, Plaintiff became the Visual Merchandiser exclusively for the Scranton showroom. (*Id.* at ¶¶ 14-15).

Plaintiff testified that her "direct supervisor" was the Regional Director of Sales ("RDS"), who oversaw all the Visual Merchandisers in her region. (*See id.* at ¶ 20, *see also* Howell Dep., Dec. 18, 2012, Doc. 21-3, Def.'s Ex. 1, at 35:16-23).[1] As the Scranton Visual Merchandiser, Plaintiff also worked with the Scranton Store Manager. (Def.'s Stmt. at ¶ 22). From July 2008 to October 2010, the RDS was Angela Miller[2] ("Miller"). (*Id.* at ¶ 21). The Scranton Store Manager between October 2008 and September 2010 was Diane Wondoloski ("Wondoloski"). (*Id.* at ¶ 23).

In 2010, Defendant had several personnel changes affecting its Scranton store. In mid- to late September, Lee Soto ("Soto") replaced Wondoloski as Scranton Store Manager. (*Id.* at ¶ 58; Soto Dep., Doc. 21-3, Def.'s Ex. 4, at 76:15-16). In December 2010, Lawrence

---

[1] Despite her deposition testimony to the contrary, Plaintiff denies that the RDS was her supervisor in her Answer to Defendant's Statement of Undisputed Facts ("Pl.'s Stmt"). (Doc. 17, at ¶ 20).

[2] Subsequently, Miller married and changed her name to Castro. (Castro Certification, Doc. 21-4, at ¶ 1).

2

Haring ("Haring") replaced Miller as RDS. (Def.'s Stmt. at ¶ 44). Haring reported to Robert Resnik ("Resnik"), who became Vice President of Sales for Defendant's Philadelphia market in August 2010. (*Id.* at ¶¶ 43-44). Plaintiff believes that Haring and Resnik, like Miller and Wondoloski, generally treated her fairly and never discriminated against her. (*Id.* at ¶¶ 41-42, 46-47). In contrast, Plaintiff believes Soto treated her unfairly and discriminated against her on the basis of her age.

In the roughly four-month period Soto worked with Plaintiff, he routinely and roundly criticized her performance. (*See* Soto Dep., Def.'s Ex. 4, at 76:15-16; Def.'s Stmt. at ¶¶ 62-64, 68-69, 77, 88, 99). Soto criticized the amount of time it took her to complete assigned tasks. (*Id.* at ¶ 63). He criticized the way she set up furniture displays. (Def.'s Stmt. at ¶ 64). Further, Soto told Plaintiff that the showroom was not up to par and that she was not doing a good job. (*Id.* at ¶ 62).

In December 2010, Soto criticized Plaintiff for leaving work without ensuring that an open space on the showroom floor had been filled. (*Id.* at ¶ 68). After censuring Plaintiff in person for the incident, he reiterated his disappointment to Plaintiff in an email with an attached photo of the open space. (Doc. 21-3, Def.'s Ex. 1F). Soto again met with Plaintiff two days later to discuss Plaintiff's performance. (Def.'s Stmt. at ¶ 77). Soto documented the discussion in a subsequent email, which he simultaneously sent to Haring as well as Plaintiff. (Doc. 21-3, Def.'s Ex. 1H). Ultimately, this email was forwarded to be placed in Plaintiff's personnel file. (*Id.*).

Sometime between late-December 2010 and early-January 2011, Soto sought the assistance of the Visual Merchandiser for Defendant's Stroudsburg, Pennsylvania store, Jennifer Conklin ("Conklin"), to help improve the appearance of the Scranton showroom. (Def.'s Stmt. at ¶ 85; see also Howell Dep., Dec. 18, 2012, at 128:2-9). Conklin spent about a day in the showroom providing "fresh eyes" and a "new perspective" as to how it might be rearranged. (Howell Dep., Dec. 18, 2012, at 126:25-127:19, 129:15-21).

On Saturday, January 15, 2011, Soto sent Plaintiff another email requesting that "[f]irst thing Monday morning" she "plan on addressing" several specific "concerns . . . regarding merchandise placement on the floor." (Doc. 21-3, Def.'s Ex. 1I). In the email, which was simultaneously sent to Haring, Soto instructed Plaintiff to refrain from making any further merchandise moves until he "was satisfied with [their] placement." (Id.). Soto also instructed Plaintiff to seek his approval only via e-mail going forward. (Id.).

At 11:48 AM the following Monday, January 17, 2011, Soto resent the email to Haring. (Id.). In the forwarded email, Soto including the following message for Haring:

> . . . I was not satisfied with the walk thru [sic] early this morning. [Plaintiff] Becky was deflecting and making excuses. . . . It is more of the same that has led me to have no confidence in her and her abilities as a visual [merchandiser]. I will document the walk thru [sic] this morning in an email and include you. My recommendation moving forward is that I do not see her making the adjustments necessary to continue as a visual for P1.[3]

---

[3] During his deposition, Soto explained what he meant by "P1" and his recommendation. (Soto Dep., Def.'s Ex. 4, at 116:20-117:6). "The P1 showroom at the time was the largest volume showroom in the three-store area: the three stores meaning Stroudsburg, Wilkes-Barre, and Scranton. . . . [Scranton] had the most traffic and had the most needs. . . . [W]hether [Plaintiff] should move to a lower volume showroom is not my call, but . . . I did not feel that she was making the adjustments necessary to continue as a visual [merchandiser] for P1 and that's what I said." (Id.).

4

(*Id.*).

Haring responded approximately twenty minutes later stating, "I want you to terminate her today based on performance. . . . Just tell her that she is not meeting . . . expectation[s] and based on her poor performance we will have to part ways. Time to say good bye [sic]. Let me know when this is complete." (*Id.*). As Plaintiff was leaving for lunch, Soto told her she was being fired for poor performance. (Def.'s Stmt. at ¶ 100; Howell Dep., Dec. 18, 2012, at 122:15-123:4). Upon Plaintiff's discharge, she was replaced by Conklin. (*See* Conklin Dep., Doc. 21-3, Def.'s Ex. 3, at 18:24-19:6).

### III. Statement of Disputed Facts

There are four key issues of fact. First, there is an issue regarding the relationship between Soto and Plaintiff. Plaintiff asserts that, in addition to RGA Haring, Soto was her supervisor at the time of her firing. (Pl.'s Stmt. at ¶ 20). Plaintiff points to Soto's deposition testimony in which he refers to himself as her "manager." (Soto Dep., Pl.'s App., Doc. 26, at 46:5-25). In its Reply Brief, Defendant claims that Soto misspoke and corrected his testimony during cross-examination. (Doc. 28 at 16 n. 6 (*citing* Doc. 21-3, Def.'s Ex. 4, at 120:14-121:15, 123:3-124:1)). According to Defendant, RDS Haring was Plaintiff's sole supervisor at the time of her discharge. (*See* Def.'s Stmt. at ¶ 20).

Relatedly, there is a dispute of fact as to the role Soto played in Plaintiff's termination. Plaintiff appears to put forth two theories implicating Soto in the discharge decision. First, Plaintiff asserts that Soto made the decision and "personally terminated" her

5

based on her age. (Pl.'s Stmt. at ¶ 104). Second, Plaintiff alleges that even if Haring made the decision to fire Plaintiff, Haring based his determination on Soto's discriminatory recommendation. (*See id.* at ¶ 105).

In response, Defendant maintains that Haring was the only one who fired Plaintiff. (Def.'s Stmt. at ¶ 105). According to Defendant, "Soto did not have the power to discharge Plaintiff." (*Id.*). Haring states that his decision was based on his own observations, conversation with Miller and Resnik and the owners' dissatisfaction with the appearance of the Scranton showroom. (Haring Certification, Doc. 21-6, at ¶ 13). Notably, Haring does not state that he considered Soto's opinion. (*See id.*). Further, Haring alleges, "Mr. Soto did <u>not</u> recommend that Ms. Howell's employment be terminated." (*Id.* at ¶ 12, emphasis in original). Finally, Haring states that he "did not take into consideration at all Ms. Howell's age which, in any event, I was not even aware of." (*Id.* at ¶ 16).

The third area of dispute relates to Plaintiff's work performance both before and after the arrival of Soto. Plaintiff claims that she "always performed her job in an exemplary manner" during her twelve-year tenure as a Visual Merchandiser for Defendant. (Pl.'s Stmt. at ¶¶ 48-50; Howell Dep., Apr. 26, 2013, Def.'s Ex. 2 at 43:15-17). Plaintiff relies on the certifications of her former supervisor and coworker Norm Welsh ("Welsh") and David Remetz ("Remetz"). (Pl.'s Stmt. at ¶ 31). Further, Plaintiff states that Defendant "never undertook any disciplinary or adverse employment action against" her. (*See id.* at ¶¶ 31-34). Notably, the only documented records of disciplinary action provided to the Court are

6

Soto's emails to Haring. (*See* Def.'s Exs. 1F-1I, 5). Accordingly, Plaintiff contends that complaints about her performance only arose after Soto's arrival. (Pl.'s Br. in Opposition, Doc. 25, at 12).

In contrast, Defendant contends that Plaintiff exhibited poor work performance prior to Soto becoming the Scranton Store Manager and up until her discharge. According to Defendant, every managerial employee that set foot in the Scranton showroom noticed and criticized its subpar appearance. Haring certifies that, in addition to Soto's dissatisfaction, he "was disappointed with its appearance" based upon his personal assessment. (Doc. 21-6 at ¶¶ 8, 12). Haring also states that his boss, Resnik, and his predecessor, Miller, both informed him "that they were unhappy with [Plaintiff's] performance and of how poorly the Scranton showroom looked from a visual merchandising standpoint." (*Id.* at ¶ 6). In addition, Defendant's owners were allegedly disappointed about the appearance of the Scranton showroom. (*Id.* at ¶ 7). Defendant further alleges that Soto's predecessor, Wondoloski, was unhappy with Plaintiff's work performance. (Def.'s Stmt. at ¶ 25). Finally, Plaintiff's replacement, Conklin, noted that the Scranton showroom had not been visually appealing. (*Id.* at ¶ 87).

Finally, there is issue of fact regarding Conklin's qualifications and her replacement of Plaintiff. According to Plaintiff, Conklin, who was twenty-eight years old at the time of Plaintiff's discharge, "had absolutely no background or experience as a Visual [Merchandiser] either by way of education, employment, or training." (Pl.'s Br. in

7

Opposition, Doc. 25, at 12; Pl.'s Stmt. at ¶ 117). Moreover, Plaintiff alleges that Soto recommended Conklin to replace Plaintiff and played an integral role in the decision to have her transferred to Scranton. (*See* Def.'s Stmt. at ¶ 107; Pl.'s Stmt. at ¶ 107). In contrast, Haring certifies that he "made the decision as to who would replace Ms. Howell," and "age was never a factor." (Doc. 21-6 at ¶ 17).

## Analysis

### a. Standard of Review on Motion for Summary Judgment

Through summary adjudication, courts may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d

1358, 1363 (3d Cir. 1992). Likewise, courts must construe questions of credibility in favor of the non-moving party. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990) ("We are keenly aware that credibility determinations are not the function of the judge. . . .") (*citing Anderson*, 477 U.S. at 249, 255).

b. Discussion[4]

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, terms, conditions or privileges of employment on the basis of their age. *See* 29 U.S.C. § 623(a)(1). Because there is no direct evidence of age discrimination in this case, the Court will apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (reaffirming the use of the *McDonnell Douglas* standard in ADEA cases). Under *McDonnell Douglas,* the plaintiff bears the initial burden of showing a prima facie case of discrimination. 411 U.S. at 802. Because Defendant does not dispute that Plaintiff offers a prima facie case of age discrimination,[5] the burden shifts to Defendant "to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith*, 589 F.3d at 689-90.

---

[4] Because it is "proper to address ADEA and PHRA age discrimination claims collectively," the Court will consider both claims simultaneously. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n. 3 (3d Cir. 2010); *see also Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 509 n. 2 (3d Cir. 2004) (noting "the same legal standards and analysis are applicable to claims under both the ADEA and the PHRA" (internal quotations omitted)).

[5] Defendant reserves "its right to challenge Plaintiff's ability to establish her *prima facie* case," but for purposes of its Motion, "Defendant challenges only Plaintiff's ability to produce evidence of pretext at the third step of the burden-shifting paradigm[.]" (Def.'s Br. in Support, Doc. 21-7, at 17).

"This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (*citing Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (internal quotation marks)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (*citing Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)). Here, Defendant sets for a legitimate non-discriminatory reason for firing Plaintiff. According to Defendant, Plaintiff was terminated due to her poor performance as a Visual Merchandiser; "age was never a factor." (Haring Certification, Doc. 21-6, at ¶¶ 13, 16, 17).

Once the defendant offers a legitimate non-discriminatory reason, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426 (*citing Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). To survive summary judgment, "the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Plaintiffs may also demonstrate discriminatory animus under the ADEA by utilizing the "cat's paw" theory.[6] *Patel v. Shinseki*, 2:12-CV-00969, 2013 WL 6199566, at *12 (W.D. Pa.

---

[6] As the Supreme Court explained, the "term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In

10

Nov. 27, 2013) (noting that the "Third Circuit had previously embraced the "cat's paw" theory in the context of an ADEA claim" in *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265 (3d Cir. 2001)); *see also Greenawalt v. Clarion Cnty.*, 459 F. App'x 165, 169 (3d Cir. 2012). Under a "cat's paw" claim, a plaintiff may demonstrate discrimination by offering evidence that "those exhibiting discriminatory animus influenced or participated in the decision to terminate" her. *Greenawalt*, 459 F. App'x at 169 (*quoting Abramson*, 260 F.3d at 286).

Here, Plaintiff appears to argue in the alternative that either Soto terminated her or Haring fired her based on Soto's recommendation. First, Plaintiff asserts that Soto "personally terminated her from her position of employment." (Pl.'s Br. in Opposition, Doc. 25, at 2). In response, Defendant relies on Haring's Certification in which he states that he alone "made the decision to discharge Ms. Howell. Mr. Soto did not have the power to make the discharge decision or to communicate it to her absent my direction." (Doc. 21-6, ¶ 16).

While Howell acknowledged during her deposition that RGA Haring was her "direct supervisor" (*see* Dec. 18, 2012 Dep. at 35:16-23), there is an issue of fact as to whether Soto, as Store Manager, also had a supervisory role over Plaintiff. Plaintiff points to Soto's deposition testimony where he refers to himself as Plaintiff's "manager." (Pl.'s Stmt. at ¶ 20; Soto Dep., Doc. 26, at 46:5-25). Moreover, Soto's emails to Plaintiff in the weeks leading

---

the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n. 1, 179 L. Ed. 2d 144 (2011) (internal citation omitted).

up to her discharge tend to support her claim that Soto was her supervisor. (*See* Def.'s Exs. 1F-1I, 5). In these emails, Soto tells Plaintiff to "approve moves with me" and to not make other "moves that you were thinking about until I am satisfied[.]" (Def.'s Ex. 5). Soto also reprimands Plaintiff and instructs her that the "failure to show a dramatic improvement may result in further disciplinary action up to and including termination." (Def.'s Ex. 1H).

Second, Plaintiff asserts that even if Soto did not personally have the authority to terminate her employment, Haring's decision to fire her was predicated upon Soto's recommendation. (*See* Pl.'s Br. in Opposition at 6). In support of this assertion, Plaintiff points to the email Soto sent to Haring the morning of her discharge. (Def.'s Ex. 5). The email states, "My recommendation moving forward is that I do not see her making the adjustments necessary to continue as a visual for P1." (*Id.*). However, Haring avers, "Mr. Soto did <u>not</u> recommend that Ms. Howell's employment be terminated." (Haring Certification at ¶ 12, emphasis in original). As a result, there are issues of fact as to whether Soto made a recommendation to fire Plaintiff and, if he did, the extent to which Haring considered his recommendation.

Related to Plaintiff's contention that Soto influenced, if not directly initiated, her discharge is Plaintiff's further assertion that Soto fabricated and exaggerated her employment deficiencies. According to Plaintiff, she "performed in an exemplary manner for approximately 12 years" before Soto became Store Manager, and it was not until Soto's arrival that Defendant took disciplinary action against her. (*See* Pl.'s Br. in Opposition at

10). Defendant responds that Plaintiff's performance issues predated Soto and were well known to Defendant's management team. (*See* Haring Certification at ¶¶ 6-9).

However, nowhere in the record provided to the Court does Defendant demonstrate documentation of Plaintiff's alleged preexisting inadequacies. Instead, Defendant relies on its employees' post hoc criticism rather than reported misconduct in Plaintiff's personnel file. Given Plaintiff's long employment history with Defendant and the nature of her work, Defendant's lack of documentation significantly undercuts its argument for summary judgment. The performance of a Visual Merchandiser is a largely matter of aesthetics and escapes objective evaluation. (*See id.* at ¶ 4). As a result, whether Plaintiff was performing poorly is essentially a matter of opinion and credibility—Plaintiff and her certifications against Defendant and its averments. Such questions of credibility are precisely the sort of issues courts are precluded from making in considering motions for summary judgment. *See J.F. Feeser, Inc.*, 909 F.2d at 1531 (*citing Anderson*, 477 U.S. at 249, 255).

Defendant argues that Plaintiff cannot rely on a lack of poor performance reviews since there is no "evidence that Defendant's policies required that she receive progressive forms of discipline prior to discharge." (Def.'s Reply Br. at 10-11). Defendant cites *Smith*, 589 F.3d 684, but *Smith* is inapposite to the case at bar. In *Smith*, a newly appointed supervisor fired an employee after reviewing his administrative file. 589 F.3d at 686-88. The supervisor's predecessor set had forth a series concrete objectives for the employee to implement and specific dates for their implementation. *Id.* at 686-87. In reviewing the

13

employee's file, the new supervisor found that the employee had not achieved any of designated performance goals, a fact the employee acknowledged. *Id.* In light of this documented lack of performance as well as other objective and subjective performance measures, the employee was terminated. *Id.* at 688.

Here, in contrast, Plaintiff denies any performance deficiencies and there is no record of poor performance until the arrival of Soto. Despite this absence, it appears that Defendant did have an administrative system in place to record employee misconduct. (*See* Def.'s Ex. 1H). Indeed, when Soto reprimanded Plaintiff for leaving the store without ensuring that a hole in the furniture display was filled, a report of the incident was forwarded for Plaintiff's personnel file. (*Id.*). As a result, an issue of fact exists regarding the quality of Plaintiff's performance as a Visual Merchandiser prior to her discharge.[7]

In addition to relying on her alleged history of "exemplary" work performance as evidence of pretext, Plaintiff also points to the nature of Soto's criticisms. Plaintiff posits that upon "being appointed as the Store Manager of the Scranton showroom, Soto began making a litany of complaints to everyone regarding Plaintiff's job performance," complaints which "were largely, vague and ambiguous." (Pl.'s Br. in Opposition at 5). "The only specific complaint repeated over and over by Soto was that Plaintiff was not making the floor moves quickly enough." (*Id.* at 6). However, this issue, Plaintiff states, "was an

---

[7] Defendant also argues that Plaintiff should be precluded from contesting her performance issues since she admitted "sometimes ha[ving] trouble with" Miller and Wondoloski, Haring and Soto's predecessors. (Def.'s Reply Br. at 14-15). Despite this partial admission, there is no record of Miller or Wondoloski taking disciplinary action against Plaintiff, and Plaintiff contests the validity of their criticism. (*See* Pl.'s Stmt. at ¶¶ 26-29, 57, 63, 90).

ongoing issue, which from a factual standpoint was true in that Defendant did not have sufficient warehouse personnel to immediately make floor moves." (*Id.* at 7).

Plaintiff further asserts that her successor's lack of experience and training as well as Soto's influence in her hiring demonstrates that Defendant's stated rationale for discharge was pretextual. Conklin, according to Plaintiff, was hired because of Soto's recommendation. (*Id.* at 5). Soto had advocated for Conklin on basis of her alleged design background and his assessment that she would be a "good fit." (*Id.*). In actuality, Plaintiff argues, "Conklin had no background whatsoever as a Visual [Merchandiser], nor was she ever trained by Defendant for the position[.]" (*Id.*).

Finally, the timing of Plaintiff's discharge, in relation to Haring and Soto becoming RDS and Store Manager, raises an inference of pretext. Defendant terminated Plaintiff's employment on January 17, 2011. (Def.'s Stmt. at ¶ 99). Soto became the Scranton Store Manager in mid- to late September 2010, approximately four months prior. (*Id.* at ¶ 58; Soto Dep., Def.'s Ex. 4, at 76:15-16). As RDS since December 4, 2010, Haring had only been Plaintiff's supervisor for approximately a month and a half when he allegedly determined to fire her. (*See* Def.'s Stmt. at ¶ 44).

In light of the foregoing reasons, Plaintiff has marshalled enough evidence to "demonstrate . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765

15

(internal citation and quotation marks omitted). Contrary to Defendant's assertion, "a plaintiff who has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification . . . need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment." *Burton*, 707 F.3d at 427; Def.'s Mem. in Support, Doc. 21-7, at 16.[8]

Although the Court finds that Plaintiff has shed sufficient doubt upon Defendant's proffered legitimate reasons, Plaintiff also offers positive evidence of Soto's discriminatory intent. Plaintiff testified Soto treated her differently than Conklin, her successor. (Howell Dep., Dec. 18, 2012, at 126:16-128:1). On Plaintiff's account, Soto "was just totally a different person" around Conklin. (*Id.* at 127:18-19). Whereas Soto was evasive and "curt" with Plaintiff, he "lit up like a Christmas tree" while interacting with Conklin. (*Id.* at 127:9-128:1). "He was animated. He talked with her. He joked with her. He looked her in the eye." (*Id.* at 127:10-12).

In contrast, Soto would not look at Plaintiff and would not look her in the eye when they spoke. (*Id.* at 127:11-13). Plaintiff testified that Soto spoke with her as little as possible and would walk away while she was speaking with him. (*Id.* at 127:22-25). According to Plaintiff, Soto attributed his abrupt attitude towards her to his attention deficit hyperactivity disorder. (*Id.* at 127:25-128:1). When asked what it was about Soto's

---

[8] "At trial, the plaintiff must convince the factfinder "*both* that the reason was false, *and* that discrimination was the real reason." *Fuentes*, 32 F.3d at 763 (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993) (emphasis in *Fuentes*)). However, the plaintiff need not make this dual showing at the third stage in the *McDonnell Douglas* analysis. *Burton*, 707 F.3d at 426-27.

interaction with Conklin that made her believe her discharge was due to her age, Plaintiff accredited the differential treatment to Conklin being "young and cute" and her being "older and not so cute." (*See id.* at 128:20-129:1).

Aside from her own observations about how Soto treated her relative to Conklin, Plaintiff also relies on the testimony of her former coworker, Elijah Williams ("Williams"), and the manner in which Soto interacted with other older female employees. Williams testified Soto's attitude towards Plaintiff was "different altogether" from the way he treated Conklin. (Pl.'s App., Williams Dep., at 21:21-22:13). According to Williams, Soto was "pleasant" towards Conklin and "nicer" to her. (*Id.*). Additionally, Plaintiff testified that she believed Soto discriminated against her because of her age based on how he treated several older, female salespersons. (Howell Dep., Dec. 18, 2012, at 130:11-19). Just as Plaintiff stated that Soto was evasive and curt with her, she similarly observed Soto treat sales agents Janice Swartz, Dolores Ladyka, Peg Harris and Kathy in a "very dismissive" manner. (*Id.* at 130:11-133:2).

Viewing the facts in the light most favorable to the Plaintiff, there is sufficient evidence for reasonable finder of fact to discredit Defendant's proffered justification for firing her. *See Burton*, 707 F.3d at 427. Thus, Plaintiff has met her burden at the third stage in the *McDonnell Douglas* analysis.

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion for Summary Judgment. A separate Order follows.

_____
Robert D. Mariani
United States District Judge